UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LYNNE GARDNER and BRET GARDNER, husband and wife, | NO. 2:19-CV-0207-TOR |
| Plaintiffs, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| WELLS FARGO BANK, NA, | |
| Defendant. | |

BEFORE THE COURT is Defendant's Motion for Summary Judgment (ECF No. 59). This matter was submitted for consideration with telephonic oral argument on July 8, 2021. Sarah N. Harmon appeared on behalf of Plaintiffs and Catharine M. Morisset appeared on behalf of Defendant. The Court has reviewed the record and files herein, considered the parties' oral arguments, and is fully informed. For the reasons discussed below, Defendant's Motion for Summary Judgment (ECF No. 59) is **GRANTED**.

//

## BACKGROUND

This case concerns alleged workplace discrimination and wage violations that Plaintiff Lynne Gardner experienced during her hiring process and employment with Defendant Wells Fargo between June 2016 and August 2017. ECF No. 1. The following facts are not in dispute except where noted. Plaintiff began working for Defendant in 2001 and has been employed in various capacities, including Service Manager (2001–2004), Floating Financial Center Manager (2004–2006), Store Manager (2006–2011), and Community Relations Officer (2011–2015). ECF No. 63 at 2, ¶¶ 2–8. In January 2016, Plaintiff[1] and her spouse, Plaintiff Bret Gardner, moved to Washington following Mr. Gardner's transfer of employment. *Id*. at 3, ¶ 11. In June 2016, Plaintiff applied for a position as a Wells Fargo Home Mortgage Consultant ("HMC") at the Kennewick, Washington branch. *Id*. at 6, ¶ 28; 72 at 1, ¶ 1.

Plaintiff was offered a position as a Junior HMC on July 28, 2016. ECF No. 63 at 8, ¶ 44. Junior HMCs work with more senior HMCs to develop sales skills and referral partners, and to provide opportunities for partnerships with the senior

---

[1]     For the purposes of this Order, "Plaintiff" refers to Plaintiff Lynne Gardner, as her claims are the primary focus of this litigation. The Court will refer to Plaintiff Bret Gardner as "Mr. Gardner."

HMC to service existing referral partners. *Id*. at 5, ¶ 21. "Senior HMC" is not an official job title at Wells Fargo. *Id*. at ¶ 22. Rather, Defendant appears to use the term to describe the training relationship between a Junior HMC and an HMC. Generally, an existing HMC requests to hire a specific individual as a Junior. *Id*. at ¶ 23. That was not the case with Plaintiff; she applied for an HMC position directly. *Id*. at 6, ¶ 28.

As part of her hiring process, Plaintiff interviewed with a Wells Fargo recruiter and David Griffith, who was the Kennewick Branch Manager at the time. *Id*. at ¶¶ 29–30. Mr. Griffith understood Plaintiff did not have any prior experience selling mortgages, nor did she have any local contacts in the real estate community as she and Mr. Gardner were moving from Virginia. *Id*. at ¶ 30. Consequently, Mr. Griffith believed initially pairing Plaintiff with a more-senior HMC who would "show her the ropes, help her meet referrals, and help her build her network" was the best way to help Plaintiff succeed as an HMC. *Id*. at 7, ¶ 37. Mr. Griffith also contacted the Kennewick banking-side Branch Manager to see if they had any banking positions available for Plaintiff. *Id*. at ¶ 33. Plaintiff was unaware Mr. Griffith inquired about banking-side positions nor did she apply for a banking-side position. ECF No. 72 at 2, ¶ 3.

Based on his belief that Plaintiff would be more successful in a Junior/senior HMC arrangement, Mr. Griffith approached Kyle Purdy, an existing HMC, to see

if he would consider taking Plaintiff as his junior. ECF No. 63 at 7, ¶ 38. However, Mr. Purdy had not yet met the minimum production levels required by Defendant's policies to take on a Junior HMC, so Mr. Griffith sought permission from Kade Lyons, the Area Manager, and Jonathan Taylor, the Vice-President Regional Sales Manager. *Id*. at 8, ¶ 42. The request was approved, and Plaintiff began her employment term in August 2016. ECF Nos. 72 at 3, ¶ 8; 80 at 4. The parties dispute Plaintiff's exact start date. *Id*.

Pursuant to Defendant's compensation policy, all HMCs began at a guaranteed advance hourly rate of pay for a set period. ECF No. 63 at 10, ¶ 58. The individual hourly rate and duration of the guaranteed period varied based on an HMC's skills, qualifications, anticipated sales acumen, and any wage negotiations. *Id*. at 11, ¶ 60. During the guaranteed advance period, HMCs would receive credit for commissions earned on funded loans, but they would not receive a commission payment until the commission credits exceeded their guaranteed advance. *Id*. at ¶ 59. If an HMC did not generate enough loans to meet their guaranteed advance, no deficit would carry over into the next pay period because their rate of pay was "guaranteed." *Id*. at ¶ 62. After the guaranteed advance period ended, all HMCs reverted to the same "regular advance" rate of pay. *Id*. at ¶ 61. If an HMC was unable to fund enough loans to cover the regular advance, the deficit would be carried over into the next pay period. *Id*. at ¶ 63.

Under a Junior/senior HMC agreement, the Junior HMC was eligible to receive a percentage of the HMC's commission. *See* ECF No. 60 at 45. Plaintiff and Mr. Purdy signed a Junior/senior HMC Agreement on September 23, 2016. ECF No. 63 at 10, ¶ 55. Per the terms of the agreement, any loans Plaintiff generated would be registered under Mr. Purdy's ID number and he would split 75% of the commission for those loans with Plaintiff. *Id.* at ¶ 56. Plaintiff alleges she was not credited for certain loans she generated, and thus, was not paid her earned commissions. *Id.* at 11, ¶ 64; at 12, ¶ 68; at 15, ¶ 87. Defendant disputes that Plaintiff was entitled to commissions, arguing she never exceeded her advances to earn the additional compensation. *Id.* at 11–12, ¶¶ 64–71; at 19, ¶ 121. Plaintiff claims Mr. Purdy attempted to pay her $800 in cash for the uncredited commissions as part of a "stacking scheme." *Id.* at 14, ¶ 81; ECF No. 71 at 14.

Sometime in January or early February 2017, Plaintiff discussed the cash commission situation with several other employees, and eventually Mr. Lyons contacted Human Resources ("HR") to investigate Plaintiff's concerns. *Id.* at 14–15, ¶¶ 83–94. HR investigated the situation and ultimately recommended the cash be returned to Mr. Purdy and that he be coded as ineligible for rehire following his resignation. *Id.* at 16, ¶¶ 97, 101; at 20, ¶ 125. After raising concerns about the cash commission, Plaintiff alleges she was subjected to hostility, harassment, and retaliation. ECF No. 72 at 9, ¶ 27. In July 2017, Plaintiff requested an HR

Advisor consultation about "inappropriate behavior and concerns." ECF No. 63 at 18, ¶ 115. During her discussion with the HR Advisor, Plaintiff complained of the cash-paid commission, alleged age discrimination, harassment, and retaliation, and Defendant's hiring process. *Id*. at 19, ¶ 117; ECF No. 72 at 9, ¶ 25. HR conducted an investigation into Plaintiff's concerns but was unable to substantiate any of Plaintiff's claims. ECF No. 63 at 20, ¶¶ 123–124.

Defendant disputes that Plaintiff was subjected to harassment, hostility, and retaliation, or that Defendant violated its own hiring process. ECF No. 59 at 2. Defendant does not appear to dispute that Mr. Griffith made age-related comments to Plaintiff during her interview and employment tenure. ECF No. 63 at 6, ¶ 31; at 10, ¶¶ 53–54. Rather, Defendant disputes that the comments rise to the level of age discrimination. ECF No. 78 at 5. Defendant further disputes that Plaintiff suffered intentional infliction of emotional distress because she seeks only "garden variety" emotional distress and has not produced any medical or mental health records. ECF No. 63 at 20, ¶ 126. Finally, Defendant disputes that Mr. Gardner suffered any loss of consortium because Plaintiff was not a victim of a legal wrong. ECF No. 59 at 16.

Defendant seeks summary judgment on each of Plaintiff's claims as well as Mr. Gardner's claim for loss of consortium.

//

# DISCUSSION

## I.    Legal Standard

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law.  *Id.* at 248.  Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party.  *Id.*  The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Summary judgment will thus be granted

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## A. Evidentiary Objections

Both parties object to certain evidence presented in the record. ECF No. 71 at 3–4; *see generally*, ECF No. 80. Admissibility of evidence on summary judgment is focused on content, not form; thus, inadmissible forms of evidence may be considered at summary judgment if they can be presented in admissible forms at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The Court finds the objected-to evidence can be presented in admissible forms at trial, such as direct testimony. Therefore, it is unnecessary to make any evidentiary rulings on the specific pieces of evidence at this time.

## B. Claim One—Age Discrimination

Defendants move for summary judgment on Plaintiff's age discrimination claim on the grounds that Plaintiff cannot meet her burden of establishing a prima facie case. ECF No. 59 at 4. Plaintiff argues she was singled out and treated differently because of her age during her hiring process. ECF No. 71 at 5.

The Washington Law Against Discrimination ("WLAD") prohibits employers from discriminating against employees based on protected characteristics, such as age. RCW 49.60.010. Washington courts have adopted the

evidentiary burden-shifting framework outlined in *McDonnell Douglas* for evaluating discrimination claims. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 189 Wash. 2d 516, 527 (2017). In the context of age discrimination, a plaintiff must first establish a prima facie case by demonstrating (1) she was within the statutorily protected age group, (2) she applied and was qualified for the job for which the employer was seeking applicants, (3) she was rejected for the position despite being qualified, and (4) after the rejection, the position went to a significantly younger applicant. *Kirby v. City of Tacoma*, 124 Wash. App. 454, 466 (2004).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant who must "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. (quotations and citation omitted). If the defendant meets its burden, the plaintiff must "produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext." *Id*. (citation omitted). Here, the parties' dispute focuses on whether the delay in hiring Plaintiff constituted an adverse employment action and whether Defendant acted with a discriminatory motive.

Plaintiff claims she suffered an adverse employment action when her hiring timeline, which took approximately six weeks, exceeded Defendant's standard hiring timeframe. ECF No. 71 at 6. To support her allegations, Plaintiff compares

her hiring process to two other applicants, Vanessa Gutierrez and Hanadie

Morrison, who were hired around the same time as Plaintiff.

Plaintiff submitted an application for an HMC position in June 2016. ECF

Nos. 63 at 6, ¶ 28; 72 at 1, ¶ 1. Plaintiff then met with Mr. Griffith for an informal

interview sometime later in June 2016. *Id*. Mr. Griffith provided Plaintiff with an

HMC interview guide, which she completed and returned to him. ECF Nos. 72 at

1–2, ¶¶ 1–2. Mr. Griffith passed Plaintiff's information to a Wells Fargo recruiter

who subsequently interviewed Plaintiff on June 17, 2016. ECF No. 63 at 6, ¶ 29.

Plaintiff was offered a position on July 28, 2016. *Id*. at 8, ¶¶ 43–44.

Plaintiff alleges Ms. Gutierrez and Ms. Morrison were hired more quickly

during the same timeframe in which Plaintiff's application was pending. ECF No.

71 at 8. Plaintiff seems to imply the alleged quicker hiring process was because

the two women were younger than Plaintiff. *Id*. However, Plaintiff's allegations

are not supported by the record. First, Plaintiff claims, without evidence, that Ms.

Morrison applied and was hired on June 2, 2016. ECF No. 72 at 3–4, ¶ 9. It

appears Plaintiff arrives at this conclusion based on her contention that Mr.

Griffith's testimony did not provide a date or timeframe for Ms. Morrison's

application. *Id*. at 4, ¶ 10. However, Plaintiff's own evidence contradicts her

assertion. Mr. Griffith testified that he believed Ms. Morrison's application

process took "[p]robably three weeks to a month." ECF No. 73 at 15. Plaintiff

also contends, without evidence, that Ms. Gutierrez was interviewed and hired on June 6, 2016. ECF No. 72 at 4, ¶ 12. However, Mr. Griffith testified that, more than a month before Ms. Gutierrez was offered the position, an existing HMC indicated he wished to bring on Ms. Gutierrez as his Junior HMC. ECF No. 63 at 5, ¶ 25. Thus, the evidence shows Ms. Gutierrez's and Ms. Morrison's hiring processes took approximately one month, not one day as Plaintiff alleges.

To explain the two-week longer hiring process for Plaintiff, Defendant provides several legitimate, non-discriminatory reasons. First, according to Mr. Griffith, any candidate's application process, from submission to start date, varied depending on local branch needs, availability of applicants for interviews, management schedule availability, and other factors. ECF No. 60 at 3, ¶ 6. There is no evidence that Defendant followed an established or standard hiring timeframe. Second, Mr. Griffith took a week-long vacation during Plaintiff's application period. ECF No. 63 at 7, ¶ 35. Additionally, he took time to consider other positions for Plaintiff that might be more suitable based on her prior work experience. ECF No. 60 at 6, ¶ 11. Finally, Mr. Griffith had to obtain approval from upper management before he could offer Plaintiff a position. ECF No. 63 at 8, ¶ 42. While the delay may have caused Plaintiff frustration or inconvenience, it is insufficient to establish an adverse employment action for the purposes of age discrimination.

Regarding Ms. Gutierrez's and Ms. Morrison's age and experience, Plaintiff seems to imply that because both women were "young" and "right out of college," they were less qualified than Plaintiff. ECF No. 72 at 3–4, ¶ 9; at 4, ¶ 12. First, the evidence indicates Ms. Morrison was the only one "right out of college;" there is nothing in the record to indicate Ms. Gutierrez was also a recent college graduate. *See* ECF No. 73 at 15. Next, when asked directly whether either individual had sales experience, Mr. Griffith could not recall if Ms. Morrison had prior experience. *Id.* There is no evidence in the record, such as Ms. Morrison's résumé, to prove she lacked experience. As to Ms. Gutierrez, who applied and was hired as a Junior HMC, Mr. Griffith indicated prior experience was not a concern with Junior HMCs because any risk was mitigated by the pairing with a senior HMC. *Id.* at 18.

Moreover, Plaintiff's allegation that Ms. Morrison "was less qualified than [Plaintiff] for an HMC position" is overcome by Defendant's preference for candidates that had local referral contacts. Mr. Griffith, who was the initial decision-maker with respect to hiring new HMCs, indicated he particularly valued an applicant with a local network because "most mortgage sales come from local referral sources—typically realtors" and because "[a]n HMC without existing connections to local realtors or other referral sources in the area are at a significant disadvantage." ECF No. 60 at 3–4, ¶ 7. Ms. Morrison was ultimately hired as an

HMC because she grew up in the area, had local contacts, and demonstrated a "drive" to make connections with local realtors. *Id*. at 5, ¶ 9. Plaintiff did not have any local contacts or submit additional materials demonstrating an ability or willingness to make local connections. ECF No. 63 at 6, ¶ 30.

Finally, Plaintiff claims Mr. Griffith made agist comments that give rise to an inference of discrimination. ECF No. 71 at 9. The first such comment allegedly occurred during Plaintiff's informal interview with Mr. Griffith. *Id*. After learning of Plaintiff's experience with Wells Fargo dating back to 2001, Mr. Griffith commented, "Oh really. That's a long time. You don't look that old." ECF No. 63 at 6, ¶ 31. The two other alleged comments occurred during Plaintiff's employment and were related to Plaintiff's learning and understanding of Defendant's computer system. *Id*. at 10, ¶¶ 53–54. Plaintiff does not allege those two comments contributed to her hiring delay but appears to offer them as circumstantial evidence.

Defendant does not dispute that Mr. Griffith made any of the comments but argues the comments are insufficient to establish age discrimination because the comments were "stray remarks" unrelated to the alleged adverse employment action. ECF No. 78 at 5. In the Ninth Circuit, a nexus to the adverse employment action is not always necessary. *Hartung v. Cae Newnes, Inc.*, 229 F. Supp. 2d 1093, 1100 (D. Or. 2002). However, courts that have found evidence of

discrimination unrelated to the challenged employment action have done so where the discriminatory comments were egregious or, when taken conjunctively, paint a picture of an improper motive. *See id.*

Here, Mr. Griffith's comments were not egregious, nor do they depict improper motive when viewed collectively. While inappropriate, Mr. Griffith's comments are more akin to stray remarks, particularly where Plaintiff has failed to provide additional evidence of age discrimination. When a stray remark is "uttered in an ambivalent manner" and not directly tied directly to the adverse action, it "is insufficient to create an inference of discriminatory motive." *Id.* (quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) (internal brackets omitted).

Viewing the evidence is the light most favorable to Plaintiff, no reasonable jury could conclude Plaintiff suffered an adverse employment action because of her age or that Defendant acted with a discriminatory motive. Her hiring timeframe was merely two weeks longer than her proffered comparators, Defendant offered legitimate, non-discriminatory reasons for the delay, and Plaintiff failed to assert sufficient evidence that would give rise to an inference of age discrimination. Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.

//

## C.     Claim Two—Equal Pay Act

Defendant seeks summary judgment on Plaintiff's claim under Washington's Equal Pay Act ("EPA"), RCW 49.58 *et seq*., on the grounds that Plaintiff cannot demonstrate a gender-based pay difference. ECF No. 59 at 8. Plaintiff alleges a male colleague, Derek Robinson, was paid twice as much as Plaintiff for similar job duties. ECF No. 71 at 11–12.

As an initial matter, it appears the parties continue to dispute whether Plaintiff's claim is brought under the current version of the statute as amended in 2018 (RCW 49.58.020) or the pre-amendment version (RCW 49.12.175). *See* ECF Nos. 59 at 8; 71 at 9–10. Plaintiff's EPA claim was previously scrutinized in the Court's Order Partially Granting Motion to Dismiss. ECF No. 22. Defendant moved to dismiss the claim, arguing the expanded remedies under the 2018 amendment could not be applied retroactively. ECF No. 14 at 6. The Court disagreed, finding the expanded remedies under the 2018 amendment were remedial in nature, and Plaintiff was not attempting to state a claim for one of the newly created substantive rights; therefore, RCW 49.58.020 could be applied retroactively to Plaintiff's claim. ECF No. 22 at 6–7. Consequently, Plaintiff's EPA claim and related remedies are properly raised under RCW 49.58.020.

Washington's EPA parallels its federal counterpart. *Adams v. Univ. of Washington*, 106 Wash. 2d 312, 317 (1986). Decisions interpreting the federal act

may be helpful. *Hudon v. W. Valley Sch. Dist. No. 208*, 123 Wash. App. 116, 124 (2004). "The act is broadly remedial. And we construe it to fulfill the underlying purpose of the legislature, which was to sweep away outmoded inequities and assure women equal pay for equal work." *Id*. A plaintiff must demonstrate a prima facie case by showing men and women received different pay for equal work. *Id*. (citation omitted). Employees are equally employed if "the individuals work for the same employer, the performance of the job requires similar skill, effort, and responsibility, and the jobs are performed under similar working conditions. Job titles alone are not determinative of whether employees are similarly employed." RCW 49.58.020(2).

If a plaintiff successfully proves a prima facie case, the burden shifts to the employer to prove the pay difference is justified under a statutory exception. *Hudon*, 123 Wash. App. at 124 (citation omitted). The sole defense is that the wage disparity is "based in good faith on a bona fide job-related factor or factors." *Id*. The employer bears the burden of proof for this defense. RCW 49.58.020(3)(e). Generally, an employer's reliance on a job-related factor is a question of fact. *Hudon*, 123 Wash. App. at 124.

Here, Plaintiff alleges Derek Robinson applied for, and was hired in March 2017, as an HMC with an initial guaranteed advance hourly rate of $34.62 per hour for 10 pay periods. ECF No. 72 at 5, ¶ 14. After the end of the initial guaranteed

advance period, Mr. Robinson's hourly rate reverted to $12 per hour, which was the standard hourly rate that applied to all HMCs after the initial guaranteed advance period. ECF No. 59 at 9. Plaintiff's guaranteed advance hourly rate when she began as a Junior HMC was $16.16 for 12 pay periods. ECF No. 72 at 5–6, ¶ 17. Plaintiff's hourly rate also reverted to $12 per hour after her initial guaranteed advance period. ECF No. 63 at 11, ¶ 61.

The Ninth Circuit does not explicitly require a comparator to establish a prima facie case for an EPA claim; however, if one is provided, courts closely scrutinize the specifically chosen comparator "to determine its usefulness." *Hein v. Oregon College of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (citation omitted). The Court does not find Plaintiff's chosen comparator particularly useful. Mr. Robinson was initially hired as an HMC whereas Plaintiff was initially hired as a Junior HMC. ECF No. 63 at 18, ¶ 111; at 8, ¶ 44. Plaintiff asserts it is a question of fact as to whether Mr. Robinson is a proper comparator, yet she does not allege any facts as to how her position as a Junior HMC is equal to Mr. Robinson's position as an HMC. ECF No. 71 at 11.

Conversely, the evidence suggests the positions and their duties were not equal. In particular, the Junior HMC/PMB Agreement describes a senior HMC's duties to include providing "sales coaching to the Junior HMC/PMB," providing assistance "in developing referral partners," and the option of partnering "with the

Junior HMC/PMB to service existing referral partners established by the senior HMC/PMB." ECF No. 62 at 39. While both positions perform similar duties in that they service and generate mortgages, the additional training duties required of a senior HMC equate to greater responsibilities, and also imply a dependent relationship between the Junior and senior HMC. Thus, the work performed is not equal. Plaintiff also claims a reasonable jury could find she and Mr. Robinson had comparable qualifications, but Plaintiff does not provide any evidence to support her claim. ECF No. 71 at 11.

Defendant offers another comparator, Dan O'Neill, who was hired in September 2016 as a Junior HMC, the same position to which Plaintiff was hired two months earlier. ECF No. 63 at 9, ¶ 50. Mr. O'Neill was offered the position with a guaranteed rate of $16.16 per hour for 12 pay periods, the same rate of pay offered to Plaintiff. *Id*., at 8, ¶ 44. Plaintiff did not address Mr. O'Neill as a comparator in her response. Based on the evidence, the Court finds Plaintiff has failed to establish a prima facie case because she cannot demonstrate she was paid less than similarly employed male colleagues solely because of her gender.

The Court's inquiry could end here, but for clarity, the Court will address Defendant's proffered reasons for the pay disparity. Defendant claims it had a legitimate business justification for its decision to pay Mr. Robinson a higher wage, specifically Mr. Robinson's sales experience and connections with local

realtors for referrals.  ECF No. 59 at 9.  According to Mr. Griffith, Mr. Robinson

was referred by his friend, Jamin Clark, the highest performing HMC in the

Kennewick Mortgage Branch.  ECF No. 63 at 17, ¶ 103.  Mr. Clark had been

trying to convince Mr. Robinson to leave his sales position with Under Armor in

Utah for quite some time.  *Id.* at ¶¶ 104–105  Mr. Griffith stated that Mr.

Robinson's parents were top-performing realtors in the Tri-Cities and Mr. Griffith

understood they would refer most, if not all, of their mortgage clients to Mr.

Robinson.  *Id.*  Additionally, Mr. Griffith understood Mr. Robinson to have

relationships with other relators in the area due to his parents' careers.  *Id.* at ¶ 107.

Mr. Griffith thought Mr. Robinson's connections would be "incredibly valuable"

and was also "impressed" by his high-level sales experience.  ECF No. 60 at 10, ¶

20.  Mr. Griffith reported that Mr. Lyons and Mr. Taylor were also "extremely

excited about [Mr. Robinson's] qualifications."  *Id.* at 11, ¶ 20.

The sole grounds for Plaintiff's challenge to Defendant's proffered

legitimate business justifications for the pay disparity is that Mr. Robinson had

sales experience but not banking experience while Plaintiff had both banking and

sales experience.  ECF No. 71 at 11–12.  However, banking experience was not

one of the qualifications Mr. Griffith looked for in HMC candidates.  *See* ECF No.

63 at 4, ¶ 16.  Moreover, Plaintiff's claim that she had sales experience is

unsupported by any evidence.  Despite alleging multiple times that questions of

fact exist as to why Defendant paid Mr. Robinson a higher wage, Plaintiff has failed to allege any additional facts to overcome Defendant's legitimate business justifications.

The Court finds Mr. Robinson's pay difference was "based in good faith on a bona fide job-related factor or factors." RCW 49.58.020(3). Plaintiff did not demonstrate any connections to local realtors, which was a concern raised by Mr. Griffith during his initial review of Plaintiff's application. ECF No. 60 at 6, ¶ 11. Moreover, it is undisputed that another male colleague, Mr. O'Neill, was paid the same wages as Plaintiff for the same position. Judging the evidence in the light most favorable to Plaintiff, a jury could not properly find that Defendant discriminated against Plaintiff based on her gender. Defendant is entitled to summary judgement on Plaintiff's EPA claim.

### D. Claim Three—Failure to Pay Wages Owed

Defendant moves for summary judgment on Plaintiff's claim for failure to pay wages owed pursuant to RCW 49.52.050(2) on the grounds that Plaintiff did not earn sufficient commissions to exceed her advance and was therefore owed no additional compensation. ECF No. 59 at 11. Plaintiff alleges she was entitled to commission payments for loans she generated and entitled to reimbursements for various work-related expenses. ECF No. 71 at 13, at 16.

Under Washington law, an employer is guilty of a misdemeanor if it

willfully and intentionally withholds an employee's wages. RCW 49.52.050(2).

Plaintiff claims she was owed wages in the form of commissions for loans she

originated between August 2016 and March 2017. ECF No. 71 at 13. It is unclear

precisely to which loans Plaintiff believes she is entitled a commission, as her

Complaint and current briefing offer differing dates and quantities. *Compare* ECF

No. 1 at 6, ¶ 3.16 (alleging Plaintiff generated two loans in November and

December 2016, and an another two in January 2017) *with* ECF No. 71 at 13

(claiming Plaintiff closed two loans on her own, but listing "one in November, one

in December, and four in February" as well as "assisting Mr. Purdy with several of

his loans"). Plaintiff describes, at length, a "stacking" scheme, which she believes

is the reason she was not properly credited for loans. ECF No. 71 at 12–16.

Plaintiff alleges the stacking scheme was used at the Kennewick branch as a way

to "game" the commission system. *Id.* However, the evidence in the record

demonstrates that Plaintiff simply never generated enough loans to achieve a

commission payment above her regular compensation.

To illustrate, Defendant's Home Mortgage Incentive Compensation Plan for

Home Mortgage Consultants and Private Mortgage Bankers (the "Compensation

Plan") provided that new HMCs received a guaranteed "draw" or advance towards

commissions. ECF No. 63 at 10, ¶¶ 57–58. New hires were paid an hourly

"guaranteed advance" for a predetermined number of pay periods. *Id.* at ¶ 58.

During that period, HMCs would earn credit towards commissions for any loans funded but would not receive compensation beyond their "guaranteed advance" until the earned commission exceeded the guaranteed advance. *Id.* at 11, ¶ 59. At the expiration of the guaranteed advance period, HMCs received a "regular advance." *Id.* at ¶ 61. If an HMC did not generate enough loans to meet the regular advance amount, any deficiency would carry over into the next pay period. *Id.* at ¶ 63. Conversely, deficits incurred during the guaranteed advance period did not carry over to the next pay period. *Id.* at ¶ 62.

In addition to the regular Compensation Plan, Plaintiff executed a Junior HMC/PMB Agreement with senior HMC, Kyle Purdy, on September 23, 2016. *Id.* at 10, ¶ 55. Under the Agreement, all loans generated by Plaintiff would be registered under Mr. Purdy's ID. *Id.* at ¶ 56. Mr. Purdy would then split 75% of the commissions earned on Plaintiff's loans with Plaintiff. *Id.* Plaintiff alleges she funded two loans in November and December 2016, but she did not receive credit or commission for either. *Id.* at 11, ¶ 64, at 12, ¶ 68. Plaintiff claims that after she approached Mr. Purdy about the November and December 2016 loans, he attempted to pay her in cash by sliding an envelope containing $800 under her office door. ECF No. 63 at 14, ¶ 81.

Plaintiff alleges the cash commission payout was part of the office-wide "stacking scheme." ECF No. 72 at 6, ¶ 19. According to Plaintiff, an "HMC and

HMC Jr. would record commissions and sales under one lender, and pay out splits in cash to give each lender a higher commission." *Id.* Plaintiff contends "Mr. Griffith testified that he heard several complaints over the years of cash commissions and stacking between Jr/Sr HMCs, but did not investigate." Plaintiff mischaracterizes Mr. Griffith's testimony. When asked if he heard "that cash commissions were being exchanged," he responded that he had not, he had only heard "gossip." ECF No. 73 at 22. Mr. Griffith indicated he did not "do any research" into the issue because "there was no evidence" and he was hearing about the issue "from a third-party." *Id.* When asked whether he had been informed by the prior branch manager of any cash commission complaints, Mr. Griffith indicated there had not been any complaints. *Id.* at 23. Plaintiff also implies Mr. Griffith acknowledged "other side cash exchange agreements" in a conversation with an HR representative. ECF No. 72 at 6, ¶ 19. However, the HR interview notes indicate Mr. Griffith learned of the other side agreements from Plaintiff. ECF No. 73 at 42.

As further evidence of the stacking scheme, Plaintiff alleges Mr. Griffith removed at least four commission splits from her commission report at Mr. Purdy's request. ECF No. 72 at 7, ¶ 20. Plaintiff's relied-upon evidence is not provided in the record. *See id.* Moreover, other evidence presented by Plaintiff contradicts her allegation. Specifically, the HR interview report suggests Mr. Griffith attempted to

demonstrate how the commission system worked to Plaintiff by adding and removing loans in the commission tracking system. ECF No. 73 at 44. Mr. Griffith stated he tried to show Plaintiff "a few times" how she needed to exceed the advance in order to receive commission payments. *Id.* Despite spending "hours" with Plaintiff to show her she was paid correctly (ECF No. 73 at 44), Plaintiff never understood the commission system. ECF No. 60 at 8, ¶ 16.

With regard to the one loan Plaintiff claims for November 2016, Defendant asserts that even if Plaintiff had been credited for the highest of the two loans listed under Mr. Purdy's ID for that month, she would have earned $801.56 in commission, which was insufficient to exceed her guaranteed advance of $3,512.10; therefore, she would not have been entitled to the $801.56 commission payment. ECF No. 63 at 11, ¶¶ 65–66. Similarly, in December 2016, during which Plaintiff claims she generated a loan, had Plaintiff received credit for the highest loan listed on Mr. Purdy's commission report, she would have earned $1,157.33 in commission, which was below her $3,317.36 guaranteed advance; therefore, she would not have been entitled to the commission payment. *Id.* at 12, ¶¶ 69–70.

Plaintiff's "stacking scheme" argument is unpersuasive, and it cannot overcome the fact that she did not generate enough loans to earn any commission payouts. Plaintiff's argument that she was not credited for "a single loan" until

March 2017 is equally unconvincing.  ECF No. 71 at 13–14.  In fact, Plaintiff's

commission report reflects credits for two loans in January 2017.  ECF No. 79 at

30.  Plaintiff has failed to identify any evidence demonstrating she was entitled to

loan credits that were not already reflected on her commission reports, nor has she

identified any evidence demonstrating she exceeded her advances, and was

therefore, entitled to commission payments.

Finally, Plaintiff's claim for reimbursements for travel and other expenses is

baseless because she presents no evidence to substantiate her claims.  ECF No. 71

at 16.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable

jury could find Plaintiff was entitled to commissions where she did not exceed her

advance.  Defendant did not withhold wages from Plaintiff and is therefore entitled

to summary judgment on Plaintiff's wage claim.

### E.    Claim Four—Retaliation

Defendant moves for summary judgment on Plaintiff's retaliation claim on

the grounds that raising concerns about unpaid commissions does not fall within

statutorily protected activity.  ECF No. 59 at 13.  It is unclear under which

authority Plaintiff seeks relief for her retaliation claim.  Her Complaint does not

identify a specific source of authority.  ECF No. 1 at 10, ¶¶ 6.1–6.4.  However, her

Response identifies three different sources: RCW 49.46.100 under the Washington

Minimum Wage Act, tort liability for violation of public policy, and the Washington Law Against Discrimination ("WLAD"), RCW 49.60 *et seq*. ECF No. 71 at 16–17. Plaintiff relies on the legal standard under the WLAD, but Defendant briefed Plaintiff's claim pursuant to the Washington Minimum Wage Act. ECF Nos. 71 at 17; 59 at 13.

Defendant argues Plaintiff never asserted a minimum wage claim, nor is RCW 49.46 applicable to complaints regarding compensation contracts or commission plans; therefore, Plaintiff cannot raise a retaliation claim under RCW 49.46. ECF No. 59 at 13. The Washington Minimum Wage Act prohibits employers from discharging or "in any other manner discriminat[ing] against any employee because such employee has made any complaint to his or her employer . . . that the employer has violated" Washington's minimum wage law. RCW 49.46.100.

It is unclear whether this statutory provision creates a cause of action. Other provisions in Washington law provide enforcement mechanisms for employment-related retaliation. *See, e.g.,* RCW 42.40.050; RCW 49.60.210. Where courts have considered retaliation claims raised under the Minimum Wage Act, they have done so via the public policy element of a wrongful discharge in violation of public policy claim, not as a freestanding cause of action. *See Hume v. American Disposal Co.*, 124 Wash. 2d 656, 662 (1994); *Thompson v. St. Regis Paper Co.*,

102 Wash. 2d 219, 226 (1984).  Although Plaintiff mentioned employer liability

for violation of public policy under the Minimum Wage Act, she did not brief the

issue.  ECF No. 71 at 16.

In any event, Plaintiff relies on the legal standard for retaliation claims under

the WLAD to support her claim.  *Id.* at 17.  Under the WLAD, "[i]t is an unfair

practice for any employer . . . to discharge, expel, or otherwise discriminate against

any person because he or she has opposed any practices forbidden by this chapter."

RCW 49.60.210(1).  The provisions of the WLAD are to be construed liberally.

RCW 49.60.020.  A WLAD retaliation claim is analyzed under the *McDonnell

Douglas* evidentiary burden-shifting framework.  *Cornwell v. Microsoft Corp.*, 192

Wash. 2d 403, 411 (2018).  A plaintiff must first establish a prima facie case by

showing "(1) the employee took a statutorily protected action, (2) the employee

suffered an adverse employment action, and (3) a causal link between the

employee's protected activity and the adverse employment action."  *Id.*  If the

plaintiff establishes a prima facie case, the burden shifts to the defendant who must

"articulate a legitimate, nondiscriminatory reason for the adverse employment

action."  *Id.* (internal quotation and citation omitted).  If the defendant meets this

burden, the burden shifts back to the plaintiff to produce sufficient evidence that

the defendant's reason was pretextual.  *Id.*

Here, Plaintiff cannot demonstrate the first element of the prima facie case

because she did not engage in statutorily protected activity. WLAD protects employees who oppose discriminatory practices based on a person's sex, race, sexual orientation, and other protected characteristics. *Id*.; *see also* RCW 49.60.030. Plaintiff alleges "her work environment became hostile" after raising concerns about Defendant's commission policy. ECF No. 72 at 9, ¶ 27. It does not appear Plaintiff is attempting to assert a claim for a hostile work environment, which is a term of art and a separate cause of action from retaliation. *See Francom v. Costco Wholesale Corp.,* 98 Wash. App. 845 (2000) (analyzing claims for retaliation and hostile work environment separately). Rather, it seems Plaintiff uses the phrase to describe the actions she believes were retaliatory, namely, being asked to work at a different office location, being subjected to harassing and stalking phone calls and text messages from Mr. Griffith, and being denied a promotion and book of business. ECF No. 72 at 9–10, ¶¶ 28–30.

The evidence Plaintiff relies upon is unpersuasive. Regarding her allegation that she was forced to work from a different location, Plaintiff cites her own statements made during an HR investigation, which indicate she *could have* worked from a different location, not that she was *required* to. *Id*. at 9, ¶ 28 (citing ECF No. 61 at 27). Plaintiff does not provide any other evidence demonstrating she was forced to work at a different location. Next, Plaintiff again cites her own statements from the HR investigation to support her contention she was harassed

and stalked; she does not provide any of the alleged text messages or phone message transcripts. *Id*. at ¶ 29 (citing ECF No. 61 at 26–28). Notably, the HR investigator was unable to substantiate the allegations of misconduct against Mr. Griffith. ECF No. 63 at 20, ¶¶ 123–124. Finally, Plaintiff's claim that she was denied a promotion and a book of business is unsupported by the evidence. ECF No. 72 at 10, ¶ 30. Mr. Griffith testified that Plaintiff was not assigned to a new senior HMC after Mr. Purdy left but became an HMC herself after her Junior/senior HMC agreement with Mr. Purdy terminated, and that any paperwork related to her new position would have been completed by HR. ECF No. 73 at 20. Plaintiff does not provide any evidence to support her claim that "additional paperwork of her promotion should have been completed, but never was." ECF No. 72 at 10, ¶ 30.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find Plaintiff raised complaints about discriminatory practices. Rather, Plaintiff's complaints related primarily to the alleged non-payment of commissions. Even Plaintiff's other complaints related to being forced to a new location, receiving harassing text messages and phone calls, and the failure to receive a promotion are unrelated to complaints about discriminatory practices as contemplated by the WLAD anti-retaliation statute. Thus, Plaintiff has failed to establish a prima facie case for retaliation. Defendant is entitled to summary

1  judgment on Plaintiff's retaliation claim.

2  **F.      Claim Five—Intentional Infliction of Emotional Distress**

3  Defendant moves for summary judgment on Plaintiff's claim for intentional

4  infliction of emotional distress ("IIED") on the grounds that Plaintiff has never

5  articulated outrageous conduct.  ECF No. 59 at 14.  Plaintiff claims the cash

6  commission payment, Mr. Griffith's treatment of Plaintiff, and the change in

7  Plaintiff's employment circumstances following her complaints all rise to the level

8  of extreme and outrageous conduct.  ECF No. 71 at 19–20.

9  Washington courts require three elements to prove IIED:  "(1) extreme and

10  outrageous conduct, (2) intentional or reckless infliction of emotional distress, and

11  (3) actual result to plaintiff of severe emotional distress."  *Kloepfel v. Bokor*, 149

12  Wash. 2d 192, 195 (2003) (citations omitted).  Extreme and outrageous conduct is

13  that which is "so extreme in degree, as to go beyond all possible bounds of

14  decency, and to be regarded as atrocious, and utterly intolerable in a civilized

15  community."  *Id*. (citation omitted).  It is not "mere insults, indignities, threats,

16  annoyances, petty oppressions, or other trivialities."  *Id*.  While each of the three

17  elements are questions of fact, the court first decides the threshold issue of whether

18  "the conduct was sufficiently extreme to result in liability."  *Spicer v. Patnode*, 9

19  Wash. App. 2d 283, 292–93 (2019) (quotations and citation omitted).

20

1    Plaintiff first alleges the cash-paid commission constitutes outrageous

2    conduct.  ECF No. 71 at 19.  While such action may be unethical, no reasonable

3    person could find it rises to the level of outrageous conduct that would trigger

4    liability.  Plaintiff next alleges Mr. Griffith's conduct, specifically an incident in

5    which he allegedly "screamed" at Plaintiff and "slammed his fist on her desk," and

6    his alleged harassment and electronic stalking, was outrageous.  *Id*. at 20.  Such

7    behavior is certainly inappropriate; however, those isolated incidents are more akin

8    to "mere insults, indignities, threats, annoyances, petty oppressions, or other

9    trivialities."  *See Spicer*, 9 Wash. App. 2d at 297 (finding conduct that occurred

10   occasionally would not be actionable, but because the conduct at issue lasted for a

11   period of several months, it exceeded insults, indignities, threats, annoyances, petty

12   oppressions, or other trivialities).  Moreover, Plaintiff's allegations against Mr.

13   Griffith could not be substantiated by the HR investigator.  ECF No. 63 at 21, ¶¶

14   123–124.

15        Finally, Plaintiff alleges it was outrageous to suggest Plaintiff transfer to

16   another location and then fail to reimburse her for travel expenses, and it was

17   outrageous that Defendant did not make a determination regarding the cash-paid

18   commission.  ECF No. 71 at 20.  Again, such conduct may have caused Plaintiff

19   annoyance, but it certainly is not sufficient to sustain a claim for IIED.

20   Additionally, Plaintiff's IIED briefing asserts bare facts and conclusory statements

that are unsupported by specific evidence in the record. *Momox-Caselis v. Donohue,* 987 F.3d 835, 841 (9th Cir. 2021) ("The nonmoving party must produce specific facts, by affidavit or other evidentiary materials, to show that there is a *genuine* issue for trial."). Consequently, the Court finds Plaintiff has failed to establish any genuine issues of material fact and no reasonable jury could find the alleged conduct was sufficiently extreme and outrageous to trigger liability. Defendant is entitled to summary judgment on Plaintiff's claim for IIED.

### G. Claim Six—Loss of Consortium

Defendant moves for summary judgment on Mr. Gardner's loss of consortium claim on the grounds that Plaintiff does not have a cognizable tort claim. ECF No. 59 at 16. Plaintiff conceded at oral argument that if her age discrimination and retaliation claims are dismissed, Mr. Gardner's loss of consortium claim will also fail.

"Damages for loss of consortium are proper when a spouse suffers loss of love, society, care, services, and assistance due to a tort committed against the impaired spouse." *Burchfiel v. Boeing Corp.*, 149 Wash. App. 468, 494 (2009). However, "there can be no claim for loss of consortium if no legal wrong has been committed against the impaired spouse." *Francom v. Costco Wholesale Corp.*, 98 Wash. App. 845, 870 (2000). Having dismissed all of Plaintiff's claims, the Court finds Defendant is entitled to summary judgment on Mr. Gardner's loss of

consortium claim.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 59) is
   **GRANTED**.

2. The parties' remaining motions are **DENIED** as moot; the trial and all
   other hearings and deadlines are **VACATED** as moot.

The District Court Executive is directed to enter this Order, enter Judgment
for Defendant, furnish copies to counsel, and **CLOSE** the file.

**DATED** July 12, 2021.



THOMAS O. RICE
United States District Judge